Green, J.
delivered the opinion of the court.
' The plaintiff in error was indicted in the circuit court of Hardin county, for the murder of David Sellars, a free white man, on the 11th of November, 1845.
The case was transferred to Perry county by change of- venue, and at the September term, 1849, of said court, the prisoner was brought to the bar and put upon his trial. The prisoner challenged the panel for cause, and upon the examination of the jurors it appeared that several of them were only householders and not freeholders. The court ruled that the said jurors were competent; whereupon, they were put to the prisoner, and a jury %as elected by him, he having challenged peremptorily only thirty-two jurors. Two of the jurors elected were householders only.
' It was then proved, that on the night of the 11th of November, 1845, the prisoner and a number of other negroes were at a corn-husking, at the house of John Nesbit, having been invited to assist in husking and putting up the corn and husks. After the husking was over,. and while the hands were employed in putting away the husks, a quarrel arose between some of the negroes, of whom Nelson was one. The deceased (who was the son-in-law of Nesbit, and had been requested by Nesbit to superintend the putting away of the husks,) procured a stick and struck one of the negroes. Nelson thereupon spoke in an abrupt manner to Sellars, who *520 then struck Nelson two or three blows with the stick or club. It was a hickory stick as large as a chair-post. Some of the negroes, and Nelson among them, then went off, twenty or thirty yards, in the direction of their home. They were called back to get their supper, by Ellis Nes-bit, the son of the owner of the corn. When they went back to the place where the corn had been husked, Sellars, the deceased, spoke to Nelson, who was in front, saying, “You have come back again, have you?” To which Nelson replied, “Yes, and if you will give me a white man’s chance, I will whip you like damnation.” The deceased then struck Nelson several times with the stick, knocking him down or to his knees; and as Nelson recovered the deceased struck him with the stick again, and Nelson, pressing up towards the deceased, stabbed him with a long knife which had been made by grinding a file to an edge or point. The deceased cried out, “I am stabbed;” and Nelson was pulled away and then ran off. .The deceased lived but a short time after the stab was given. He was an athletic man, weighing one hundred and sixty or one hundred and seventy pounds, and had been overseer for Mr. Elliot, (but was not his overseer at the time of the stabbing. When Nelson and others started towards home, they wrere not gone more than a minute or two before they were back again.
Joe, a slave, a witness for the defendant, proved that Nelson is a basket-maker, and had the knife, with which the stabbing was done, to work in white oak, and that he usually carried it about him. Nelson had one or two bad cuts on his head, made by the blows inflicted by the deceased, and the blood was running down his face. This is all the material testimony.
*521 The court charged the jury, “That the distinction made by the statute between murder in the first, and murder in the second degree, did not apply to the defendant; that if the proof satisfied the jury that the defendant was guilty of murder as defined by the common law, it would require them to find him guilty as charged in the bill of indictment; that malice was the distinguishing characteristic between murder and manslaughter, so far as the defendant was concerned; that murder in a slave, according to the common law definition, was a capital offence; and' that the court knew of no punishment authorized by law that the court could inflict for the offence of manslaughter in a slave.”
The court further charged the jury, “that a white man. was authorised by law to correct the slave of another, in a reasonable manner, for insolence, with a view of stopping the insolence; but when the insolence ceased, the correction should cease. That a slave may resist a stranger who attacks him in a manner to endanger his life or limb, or to do, him some great bodily harm; that to make a slave excusable for killing a white man who has no right of contool over him, but who attacks him in a manner dangerous to life or limb, or calculated to do him some great bodily harm, he must retreat as far as he can, unless the attack is so fierce that it would be more dangerous to retreat than to resist.”
The court charged the jury, “that the great distinction between homicide committed with malice, and that committed in a transport of passion suddenly excited by a grievous provocation, is as steadily to be kept in view in the trial of a slave charged with the murder of a white man, as in that of a white man charged with the murder of his equal, or of a slave. But the same mat *522 ters which would be deemed in law a sufficient provo - cation to free a white man who has committed homicide in a moment of passion, from the guilt of murder, will not have the same effect when the party slain is a white man and the offender a slave. For though among equals the general rule is, that words are not, but blows are a sufficient provocation; yet there may be words of reproach so aggravating when uttered by a slave, as to excite in a white man the temporary fury which negatives the charge of malice.” The court also charged the jury, “that so far as the offence of murder was concerned, the defendant was entitled in all respects to be treated as if he were a white man.”
Upon this evidence, and charge of the court, the jury returned the following verdict: “We find Nelson, a slave, guilty of murder in the second degree, and submit him to the mercy of the court.”
The defendant moved for a new trial, and offered the affidavit of William Horner, A. J. Taylor, Thomas Fortner, Caswell Gotham, and Richard Tucker, five of the jurors before whom the prisoner was tried, who state, “that they agreed to render the verdict of murder in the second degree, with a recommendation to the mercy of the court, upon the ground^ only that they believed, from the argument of their fellow-jurors and the- charge of the court, that the court had the power to commute the punishment from hanging to any less punishment. They state that when they agreed first to offer the verdict above spoken of, in conjunction with their fellow-jurors, and the court refused to receive the same, they supposed that the court had refused to accept the verdict and exercise any power to commute the punishment. But when they were sent for the last time, they then supposed that the court *523 bad come to the determination to receive the verdict and commute the punishment according to their former views; and it was in this view pf the case, and this only, that they would ever have been induced to join in the verdict rendered in this case. They further state, that all the jurors generally seemed to be of opinion that the court, by sending for them, had agreed to accept their verdict with the understanding stated above.”
While the argument for a new trial was pending, the prisoner offered the affidavit of A. J. Taylor, one of the jurors, who states, “that at the rendition of the verdict he did not believe that the defendant was guilty of murder, or any higher offence than manslaughter, and only agreed to said verdict for the causes stated in the former affidavit.”
The court overruled the motion for a new trial, and pronounced sentence of death upon the prisoner; from which judgment the prisoner appealed to this court.
Several questions of considerable importance are raised by this record. And first, has a stranger a right to chastise the slave of another person?
In South Carolina it is held that the criminal offence of assault and battery cannot be committed upon a slave. State vs. Minor, 2 Hill’s R. 453; State vs. Chentwood, 2 Hill’s R. 459; Hilton vs. Carton, 2 Baily’s R. 98; White vs. Chambers, 2 Bay’s R. 70. The slave is not regarded as being within the peace of the State; and therefore the peace of the State is not broken by an assault and battery on him. He can look- alone to his master for protection, who may maintain trespass for a battery on his slave.
But, in North Carolina, a different doctrine prevails, and one much more consonant to our feelings of humanity, and much more calculated to preserve the peace *524 and good order of society. It is there held, that the principles of the common law, where there is no legislation on the subject, moulded and suited to our social condition, must be held to apply to offences committed upon a slave.
In the case of the State vs. Hale, 2 Hawks. Rep. 582, chief justice Taylor says: “It would be a subject of regret to every thinking person, if courts of justice were restrained, by any austere rule of judicature, from keeping-pace with the march of benignant policy and provident humanity, which for many years has characterised every legislative act relative to the protection of slaves, and which Christianity, by the mild diffusion' of its light and influence, has contributed to promote.” And again, he says, “When the authority of the master is usurped by a stranger, nature is disposed to assert her rights, and prompt the slave to resistance. The public peace is thus as much broken as if a free man had been beaten. A wanton injury committed on a slave is a great provocation to the owner, awakens his resentment, and has a direct tendency to a breach of the peace, by inciting him to seek immediate vengeance; and if resented in the heat of blood, it would probably extenuate a homicide to manslaughter. These offences are usually committed by men of dissolute habits, hanging loose upon society, who being repelled from association with well disposed citizens, take refuge in the [company of colored persons and slaves, whom they deprave by their example, embolden by their familiarity, and then beat, under the expectation that a slave dare not resent a blow from a white man.” In view of these considerations, the court rule, that an assault and battery upon a slave by a stranger is indictable. But in view of the *525 actual condition of society, and the difference that exists between the two races, many circumstances that would not constitute a legal provocation for a battery by one white man on another, would justify it if committed on a slave, provided the battery were not excessive.
We fully concur with this view of the subject taken by the supreme court of North Carolina. We think it alike necessary to secure the rights of the master, to protect the slave from wanton abuse, and to save white men from injury and insult.
2. The next question is, may homicide committed by a slave on a free white man, not excusable in self-defence, be reduced below the grade of murder?
Upon this subject, the charge of his ■ honor, the circuit judge, is vague and indistinct. It is true, that in one part of the instruction, it is said, “that the great distinction between homicide committed with malice, and that committed in a transport of passion, excited by a grievous provocation, is as steadily to be kept in view in the trial of a slave charged with the murder of a white man, as in that of a white man charged with the murder of his equal.” And again, in conclusion,, he says, “that so far as murder is concerned, the defendant is to be treated as if he were a white man.”
These passages of instruction to the jury, taken alone, indicate pretty clearly that the judge was of opinion that manslaughter might be committed by a slave. But in another part of the instruction he says, “the court knows of no punishment authorised by law, that the court could inflict for the offence of manslaughter in a slave.” Again he says, “a white man is authorised by law to correct the slave" of another, in a reasonable manner, for, insolence; that a slave may resist a *526 stranger who attacks him in a manner to endanger his life or limb, or to do him some great bodily harm; that to make a slave excusable in killing a white man, who has no right or control over him, but who attacks him in a manner dangerous to life or limb,- or calculated to do him some great bodily harm, he must retreat as far as he can, unless the attack is so fierce that it would be more dangerous to retreat than to resist.”
The sense of these latter passages seem applicable alone to a case of excusable self-defence. The judge says, in substance, that a white man may correct the slave of another for insolence; but if the attack on the slave endanger his life or limb, or put him in danger of great bodily harm, and he cannot retreat, he is excusable, if he slay his assailant; but that the court knows of no punishment for manslaughter committed by a slave.
The case put by his honor would be clearly a case of self-defence, and, as stated by him, the slave would be excusable; and he excludes the consideration of a case of manslaughter altogether, not only by failing to put a possible case in which it may be committed, but by expressly stating that there was no punishment provided by law for that offence; thus leaving it to be inferred by the jury that the offence did not exist.
The question then is, did his honor err in this view of the subject? And it may be observed here, that the question is not, whether the owner of a slave may be guilty of an assault and battery, by the immoderately beating his slave; or, whether, if a slave slay his master while he is. enduring a cruel and inhuman chastisement, such killing could be mitigated to manslaughter.
We are aware that the supreme court of North Carolina, in the case of the State vs. Mann, 2 Dev. 263, held *527 that the master is not liable to an indictment for a battery committed on his slave, no matter how cruel and excessive such battery may be. And Judge Turley, in the case of the State vs. Jacob, 3 Hum. 920, says, “The right to obedience and submission in all lawful things, on the pai’t of the slave, is perfect in the master; and the power to inflict any punishment, not affecting life or limb, which he may consider necessary for the purpose of keeping him in such submission, and enforcing such obedience to his commands, is secured to him by law; and if, in the exercise of it, with or without cause, the slave resist and slay him, it is murder and not manslaughter; because the law cannot recognise the violence of the master as a legitimate cause of provocation.” But Green, judge, in the same case, says, “I think proper to announce distinctly as my opinion, that there may exist cases in which the killing a master by a slave would be manslaughter. What circumstances of torture, short of endangering life or limb, would so reduce a homicide, it is not easy to indicate. Every such case must rest upon its peculiar facts. The rights and duties of the parties must form the criteria by which an enlightened court and jury should act.”
Judge Reese expressed no opinion upon this point, nor was there any thing in the case to call for the dicta above referred to. The whole court concurred in opinion that there was no mitigating circumstance in the case, and that it was most clearly a case of murder.
But the case now before the court is of a different character altogether. The man who was killed, was neither the master, nor overseer of the slave. He received the wound, while he was inflicting severe blows, with a heavy cudgel, upon the prisoner’s head. It becomes *528 necessary therefore, that we determine whether, in such a case, manslaughter may be committed. In Jacob’s case, before referred to, it is asserted, that the principles of the common law are applicable to the relations that exist between the slave and his master; and with much more reason may we assert, that those principles are applicable, when the slave inflicts an injury on a white man, who is a stranger. The statute (1819, ch. 35, sec. 1,) declares, that murder, when committed by a slave, shall be punished with death. Now, what murder is, we learn from the definition of the common law. It is, “where a person of sound memory and discretion, unlawfully killeth any reasonable creature in being, with malice aforethought.” 3d Inst. 47. A slave, then, who commits a homicide, is punishable with death, if it be done “with malice aforethought.” And, unless it be so done, he is not guilty of murder. But, the killing being established, the law presumes that it was done maliciously, and circumstances of alleviation or excuse must be shown by the accused.
In general, if a party that is struck, strikes again, and death ensues, it is only manslaughter. The law regards the blow, as a sufficient provocation to excite the passions, so that the party acts under the influence of the sudden heat, and not from malice. But a slight assault, will not always extenuate a killing to manslaughter; much depends upon the character of the weapon used, in reference to the provocation. There must be a reasonable proportion between the mode of resentment, and the provocation to reduce the offence of killing to manslaughter. Archb. Crim. L. 392. So if there be proof of malice, at the time of killing, the existence of provocation will not reduce it to manslaughter. For, although *529 the provocation usually repels the presumption of malice, yet, if its actual existence be established, notwithstanding the provocation, it is murder, and not manslaughter. 1 Russ, on Cr. 440, Roscoe’s Crim. Ev. 627.
How then shall these principles be applied to the case of a slave who kills a white man?
The common law, is in the breast of the judges, and must be expounded under the influence of enlightened reason. Thus guided, it is manifest, that the same indignity which would excite the passions of a white man, would not have a like effect upon a slave. That which would be a grievous provocation to the one, would provoke the other but slightly. This difference arises from the different habits' of feeling, and modes of thought of the two races. In view of reason, then, the common law cannot hold, that an act constituting a provocation which would mitigate a homicide committed by a white man to manslaughter, shall have a like effect, when the homicide is committed on a white man, by a slave. So to hold, would be a perversion of the principles of the common law by sticking to its letter. It would be to disregard entirely the character and condition of this portion of our population; and would be as repugnant to reason, as it would be mischievous in practice.
It does not, however, follow that a provocation may not be so grievous, as that, if the slave slay the white man, it will be but manslaughter, although the life or limb of the party killing, is not endangered. On the contrary, we think there is no doubt but that cases .may • exist, where the slave committing the homicide, although not excusable, as having acted in self-defence; *530 yet he cannot be deemed to have done the act with malice aforethought.
In the case of The State vs. Will, (1 Dev. and Bat. Rep, 121,) judge Gaston, delivering the opinion of the court, held the killing to be manslaughter only. In that case too, the person killed was the overseer, and had authority to punish the prisoner. The deceased had attempted to punish the pi’isoner, who ran off, refusing to submit. The deceased got a gun, loaded with shot, and firing on the prisoner inflicted wounds in his back. He then pursued and overtook the prisoner, and a scuffle ensued, and the prisoner inflicted the fatal stab on the arm cf the deceased with a knife, the overseer then being unarmed. Here, the prisoner was not acting in self-defence, but in the heat of blood, occasioned by the smarting wounds, the act was done, and the court held that it was not done with malice.
The court cannot point out with precise accuracy what particular extent of provocation will reduce such homicide to manslaughter. Each case must depend very much on its own circumstances, and must be left to the enlightened judgment of the jury.
If the slave has misbehaved, and by his insolence has provoked merited chastisement, and punishment be reasonably inflicted upon him, it is his duty to submit; and if he resist and slay the person chastising him, it will be murder. But if the punishment be unreasonable, and excessive, the killing will only be manslaughter.
If a slave, not having misbehaved or given cause for offence, is assaulted and beaten by a stranger, who has no authority over him, and he kill the person so beating him, such killing will be extenuated to manslaughter, in cases where such extenuation would not exist, if by *531 insolence and misconduct, the slave had provoked chastisement.
Having thus stated our opinion, that by our law, manslaughter may be perpetrated by a slave, it follows that if the charge of the court to the jury, excluded the investigation of the question of manslaughter, in this case, his Honor erred. And that it was so excluded, we think has been made apparent, by the review of the charge wé have presented in the former part of this opinion.
The coui’t also misled the jury, when he told them, in effect, that there was no law in this State by which manslaughter could be punished.
It is true, the indictment of a slave for murder, does not include a charge of manslaughter; because by the act of 1819, ch. 35, sec. 1, murder, committed by a slave, is declared to be capital; and by the act of 1835, ch. 19, sec. 9, exclusive original jurisdiction is given to the circuit courts, of all offences committed by slaves which are punishable with death; and as manslaughter is not so punishable, the circuit court has no jurisdiction thereof, and therefore, it cannot be 'included in the indictment filed in that court.
But if it exists as an offence, it is punishable. By the act of 1741, ch. 24, sec. 48, (1 Scott Rev. 74, 75) any crime committed by a slave, was to be tried before three justices, and four freeholders and slaveholders, and punished at their discretion. By the act of 1783, ch. 14, sec. 2, (1 Scott Rev. 279,) trivial offences were to be .tried before one justice alone, and punished not exceeding forty lashes. But if the justice was of opinion that the offender deserved a greater punishment, he was to commit him to jail to be tried as theretofore. By the *532 act of 1815, ch. 138, sec. 1, (2 Scott Rev. 246, 247,) the 48th section of the act of 1741 is repealed, and it is provided, that offences committed by slaves shall be tried before three justices and nine freeholders and slaveholders, and if found guilty they shall pass such judgment, according to their discretion, as the nature of the crime or offence shall require.” By the act of 1819, ch. 35, sec. 1, murder, arson, burglary, rape, and robbery, are declared capital, to be punished with death; and all other offences are to be punishend as heretofore; provided that the punishment in no case shall extend to life or limb, except in the cases above enumerated, It will be seen from this review of the statutes, that all offences committed by slaves, the punishment of which is not specifically provided for by statute, may be punished at the discretion of the court and jury; provided such punishment extend not to life or limb. The act of 1815, ch. 138, is not in the compilation of Nicholson and Caruthers, and the act of 1783, ch. 14, is entirely misconceived by them, and we suppose his Honor was misled by that work.
The jury were led to the inevitable conclusion, by the charge of the court, that unless the prisoner was convicted of murder, he would be excused altogether from any punishment, and thus, doubtless, were influenced by this misdirection to render the verdict returned by them.
3. The verdict of the jury is wholly inapplicable to the case before them. They say, they “find Nelson, a slave, guilty of murder in the second degree, and submit him to the mercy of the court.”
There is' no second degree of murder, as to slaves, and perhaps, if the case depended alone upon the form *533 of this verdict, the court might pronounce judgment upon it, regarding as surplusage, the words “second degree.” But when we remember, that the law of murder a,s to white men, is divided into the first and second degree; the first, punishable with death, and the second, not so punishable; and that this law is expounded and acted on every day in our courts, and is familiar to the minds of men generally, we cannot fail to ' perceive that the jury were laboring under erroneous impressions as to the law of the case then before them. They unquestionably supposed, that under their finding, a punishment short of death, would be Inflicted. And this inference from the form oí the verdict alone, is rendered still more certain, by the affidavit of five of the jurors. They say, that from the arguments of their fellow jurors, they were induced to believe, that if they found such a Verdict, the court could adjudge a punishment short of death; and that if they had not so believed, they never would have consented to a verdict of guilty. They say, when they came into court with their verdict, the court refused to receive it, and sent them back, but soon after, sent for them again, and did receive the verdict; thereby confirming their first impression, that the court would not pronounce sentence of death on the prisoner.
We think this a stronger case than that of Crawford, in 2 Yerger’s Rep. The affidavit of the jurors, when taken alone, constitutes it very analogous to Crawford’s ease. But when we connect with their affidavit, the form of the verdict, by which the facts they state are rendered certainly true; all the danger which would otherwise exist, in receiving affidavits of jurors to impeach their verdict, is obviated. We do not think, that *534 a verdict ought to stand» when, the life of a human being is involved, which has been rendered under the influence of such manifest misconceptions of the legal effect of it; especially where these misconceptions have been produced, and fortified by the action of the court.
In the first place, the charge of the court left the jury under the impression, that unless the prisoner were punished for murder, he could not be punished at all; and they, acting under that mistaken opinion, resorted to this form of a verdict, to effect what they were led to suppose, was the judgment of the law, and at the same time, to save the life of the prisoner. Besides, it is seriously doubted by some members of the court, whether the verdict is an answer to the indictment.
The indictment is a charge for murder, simply. It includes no different grades of crime. The verdict could only be “guilty” or “net guilty.” But this verdict has manifest reference to an entirely different character of indictment; one which includes three grades of felonious homicide. The jury had in their minds, therefore, an indictment wholly different from that actually before them,- and intended their verdict as an answer to that, and not to the case now before us.
4. Upoii the facts of the case, we forbear any commentary. If Nelson, after leaving, and starting towards home, conceived the design to inflict injury on the deceased, in revenge for the blows he had. received, and returned armed, and intending, by insolence, to provoke blows again, and then to stab, it would be an aggravated case of murder. But if, without any such purpose, he returned, because he had been invited to come back to supper, and his insolent reply was prompted on a sudden, by the address of the deceased, and the previous inflic *535 tion of blows, then it will be for the jury to determine whether the blows inflicted on him, exceeded a proper chastisement for his insolence. If they did not, it would be still a ease of murder. But if the blows were inflicted with a weapon, and in a manner cruel and excessive, in view of the prisoner’s insolence, the killing would, be only manslaughter; and of this the jury must judge.
5. As to the qualification of the jurors, there is no error. By the act of of 1835, ch.-19, sec. 11, it is provided that all persons who would be competent jurors on the trial of a free person,''shall be competent on the trial of a slave. On the trial of a free person, householders are competent jurors, and therefore, householders were competent to try this case.
Upon the whole, we think there is error in the record, and that the judgment should be reversed, and the prisoner remanded for another trial.